# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DAVID GERALD MINKKINEN and
SIVARAMAN SAMBASIVAM,

      Defendants.

CRIMINAL ACTION No. **2:22-cr-00163-2**

**ORAL ARGUMENT REQUESTED**

**<u>DEFENDANTS SIVARAMAN SAMBASIVAM'S AND
DAVID GERALD MINKKINEN'S JOINT MOTION TO DISMISS COUNTS ONE
THROUGH FIVE AND MEMORANDUM OF LAW IN SUPPORT</u>**

Defendant Sivaraman Sambasivam, with the joinder of co-defendant David Gerald
Minkkinen ("Defendants"), respectfully moves this Court to dismiss Counts One and Two of the
Superseding Indictment as barred by the statute of limitations and to dismiss Counts Three through
Five of the Superseding Indictment for failure to state an offense. Defendants make this Motion
pursuant to Federal Rule of Criminal Procedure 12, *Grunewald v. United States*, 353 U.S. 391
(1957), *Toussie v. United States*, 397 U.S. 112 (1970), *Kousisis v. United States*, 605 U.S. 114
(2025), related authorities, and based upon the following Memorandum of Law in Support, the
papers and pleadings on file herein, and any documents the Court may allow at the time of the
hearing.

## I.    INTRODUCTION

In Count One of the Superseding Indictment, the Government alleges that Messrs.
Sambasivam and Minkkinen engaged in a conspiracy to steal and convey trade secrets owned by
Deloitte. The Superseding Indictment broadly alleges that this conspiracy began in or about July

2013 and continued to in or about June 2021. Most of the conduct alleged in the Superseding Indictment, however, occurred before the statute of limitations cutoff of August 23, 2017. The only specific conduct referenced in the Superseding Indictment that allegedly occurred after August 2017 are statements Defendants made to investigators denying wrongdoing and acts that took place after the alleged conspiracy's objectives were attained. Under *Grunewald*, the Government may not extend the duration of a conspiracy beyond the limitations period by alleging acts taken to avoid detection. Accordingly, Count One is barred under the statute of limitations.

Count Two, wire fraud conspiracy, likewise is barred under the statute of limitations. Messrs. Sambasivam and Minkkinen attained the objectives of any alleged wire fraud conspiracy by 2015, insofar as they allegedly obtained any property that could have been the object of wire fraud by that time. They allegedly obtained Deloitte's intellectual property no later than 2013, when they left Deloitte's employment; and they allegedly obtained any property interests associated with the Maryland-West Virginia Consortium contract no later than 2015, upon the contract's execution. Under *Grunewald*, as with the trade secret conspiracy alleged in Count One, the Government may not extend the duration of the alleged wire fraud conspiracy beyond the limitations period by alleging acts that the Defendants purportedly took after 2015 to avoid detection. Counts Three through Five, substantive wire fraud, likewise fail to state an offense because the alleged wires could not have been directed at obtaining property, as the Defendants allegedly sent the wires *after* Defendants allegedly obtained the relevant property by 2015. And Counts Three through Five also fail because on the face of the Superseding Indictment, the alleged wires constituted attempts to conceal wrongdoing from investigators and thus could not have been in furtherance of any scheme to defraud Deloitte or the Consortium.

## II.    ALLEGED FACTS

On August 23, 2022, the Grand Jury returned an Indictment against Messrs. Minkkinen and Sambasivam. (Dkt. No. 1.) And on May 31, 2023, the Grand Jury returned a Superseding Indictment. (Dkt. No. 186.) Count One of the Superseding Indictment charges conspiracy to misappropriate trade secrets, in violation of 18 U.S.C. § 1832(a)(5). Count Two of the Superseding Indictment charges conspiracy to commit wire fraud under 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1349. And Counts Three through Five charge wire fraud and aiding and abetting the same, in violation of 18 U.S.C. §§ 2, 1343. Counts One through Five are charged against both Messrs. Minkkinen and Sambasivam.

In the Superseding Indictment's Introduction, the Government alleges that Deloitte used Unemployment Framework for Automated Claim & Tax Services ("uFACTS"), a software platform, "to process unemployment insurance claims for state agencies." (Dkt. No. 186 ¶ 1.) Deloitte is alleged to have considered "[t]he uFACTS source code, database, use cases, software designs, business rules, schema, logic, artifacts, and architecture" as trade secrets. (*Id.*) From 2009 to 2013, Messrs. Sambasivam and Minkkinen were Deloitte employees working on uFACTS. (*Id.* ¶ 6.) Sagitec Solutions, LLC ("Sagitec"), headquartered in St. Paul, Minnesota, launched an unemployment insurance practice in 2013. (*Id.* ¶¶ 3–4.) That same year, Messrs. Sambasivam and Minkkinen ended their employment with Deloitte to work for Sagitec in its unemployment insurance practice. (*Id.* ¶ 5.) The Government alleges that Messrs. Sambasivam and Minkkinen "copied, downloaded, obtained, and transmitted" Deloitte's "files, including highly proprietary information such as uFACTS source code, data, and use cases, without authorization." (*Id.* ¶ 10.)

The Government further alleges that Sagitec used the alleged trade secrets to "design, develop, and market Sagitec's [unemployment insurance] software." (*Id.*) It alleges Sagitec won a bid in 2015 to implement such software for Maryland and West Virginia, executing a contract with

- 3 -

the Maryland-West Virginia Consortium. (Dkt. No. 186 ¶¶ 26–27.) Sagitec employees then worked with Workforce West Virginia, a public agency, "to develop and install the new . . . software." (*Id.* ¶ 28.)

In Count One, the Government first defines the purpose of the alleged trade secret conspiracy. The Government alleges that from in or about July 2013 to in or about June 2021, Messrs. Sambasivam and Minkkinen knowingly conspired "to steal trade secret information belonging to Deloitte." (*Id.* ¶ 43.) They allegedly:

    a.    "stole, and without authorization appropriated, took, carried away, and concealed, and by fraud, artifice, and deception obtained such information" from the purported owner, Deloitte;

    b.    "without authorization copied, duplicated, sketched, drew, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, and conveyed such information; and"

    c.    "received and possessed such information, knowing the same to have been stolen and appropriated, obtained, and converted without authorization."

(*Id.*) The Superseding Indictment then alleges five overt acts that were purportedly committed by Messrs. Sambasivam and Minkkinen in furtherance of the conspiracy. (*Id.* ¶ 47.) The first two overt act paragraphs, paragraphs (a) and (b), do not allege specific acts but instead allege a continuing course of conduct over more than three years to transmit, upload, and convey trade secret information. (*Id.*) The remaining three overt act paragraphs, paragraphs (c) through (e), allege specific acts consisting of purported misrepresentations made to investigators. (*Id.*)

In Count Two, the Superseding Indictment alleges that Defendants conspired "to obtain money and property by means of materially false and fraudulent pretenses" from Deloitte and the Consortium. (Dkt. No. 186 ¶ 49.) Specifically, the Superseding Indictment identifies only "Deloitte intellectual property" and "funds" associated with the Consortium contract as money and property that allegedly were the object of Defendants' wire fraud conspiracy. (*Id.* ¶ 50.) And in

Counts Three through Five, the Superseding Indictment further alleges that to execute a scheme "to defraud the Maryland-West Virginia Consortium and Deloitte to obtain money and property," Defendants transmitted three wire communications in 2017, 2020, and 2021—corresponding to the same purported misrepresentations to investigators that form the basis for overt acts (c) through (e) of Count One. (*Id.* ¶¶ 47, 56, 61.)

## III.    ARGUMENT

A defendant may file a motion to dismiss a count in an indictment as barred by the statute of limitations pursuant to Fed. R. Crim. P. 12(b)(3)(B). *United States v. Jarvis*, 7 F.3d 404, 409 (4th Cir. 1993). "The purpose of a statute of limitations is to limit" a person's criminal exposure to a "period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions." *Toussie v. United States*, 397 U.S. 112, 115 (1970). A statute of limitations protects individuals from having to defend against charges "when the basic facts may have become obscured by the passage of time." *Id.* at 114. Given these important purposes, a statute of limitations is "to be liberally interpreted in favor of repose." *Id.* (quoting *United States v. Scharton*, 285 U.S. 518, 522 (1932)).

For purposes of this motion, the Court must accept all allegations in the Superseding Indictment as true. *Cf. United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). In the Fourth Circuit, the Government must satisfy the statute of limitations both "in the indictment" as well as "at trial." *United States v. Magalnik*, 160 F. Supp. 3d 909, 916 (W.D. Va. 2015) (quoting *United States v. Kang*, 715 F. Supp. 2d 657, 663 (D.S.C. 2010)). Once a defendant raises a limitations defense, "[t]he government bears the burden of proving that it began its prosecution within the statute of limitations period." *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997).

A.    **Count One is barred by the statute of limitations.**

For the trade secret conspiracy count, the only specific overt acts falling within the limitations period are communications between Defendants and investigators. Messrs. Sambasivam and Minkkinen allegedly denied wrongdoing after attaining the central objectives of their alleged trade secret conspiracy. Even assuming the communications were designed to conceal a conspiracy, they do not serve to extend the limitations period. Under *Grunewald*, the Government may not extend the limitations period based on acts constituting a subsidiary conspiracy to conceal a crime, such as false statements to investigators.

1.    **The limitations period began to run in August 2017.**

The applicable five-year statute of limitations for all non-capital cases, including charges filed under 18 U.S.C. § 1832, is five years. *See* 18 U.S.C. § 3282(a). For conspiracies that require proof of an overt act, "the statute of limitations [period] begins to run, not from the date of the legally cognizable harm, but from the date of the last overt act." *United States v. A-A-A Electric Co., Inc.*, 788 F.2d 242, 245 (4th Cir. 1986). The statute underlying the trade secret conspiracy charge in this case, 18 U.S.C. § 1832, requires an overt act. *See* 18 U.S.C. § 1832(a)(5).

In this case, the Grand Jury returned the original Indictment on August 23, 2022. Five years before that date is August 23, 2017. For Count One, the Government must allege and prove that a conspiracy was still in existence on or after August 23, 2017, and it must allege and prove a legally sufficient overt act charged in the Superseding Indictment occurring after that date.

2.    **Any objectives of the alleged conspiracy were attained by 2016.**

The central objective of the alleged conspiracy, for purposes of *Grunewald*, was to "steal trade secret information belonging to Deloitte." (Dkt. No. 186 ¶ 43.) In further describing that objective of misappropriation, the Superseding Indictment recites the language of Section 1832(a)(1)–(3). (*See id.* ¶¶ 43(a)–(c).) Section 1832(a)(1) covers one who "steals, or without

- 6 -

authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains [trade secret] information." Section 1832(a)(2) covers one who "without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information." And Section 1832(a)(3) covers one who "receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization."

On the face of the Superseding Indictment, the alleged objective of the conspiracy—trade secret misappropriation—was attained by Messrs. Sambasivam and Minkkinen no later than 2016. Any alleged *theft* of trade secrets from Deloitte necessarily occurred in or before 2013, when Defendants left Deloitte's employment. (*See id.* ¶¶ 6, 10–20.) The Superseding Indictment further includes allegations regarding the *use* of Deloitte's proprietary information from July 18, 2013 through July 23, 2016. (*See id.* ¶¶ 11–20, 22–25, 30–31.) But these instances of alleged misappropriation occurred in connection with Sagitec's bid to implement unemployment insurance software for the Consortium in 2015. After the allegation that in July 2016, Mr. Sambasivam emailed a zip folder containing files from Deloitte's UI project in Massachusetts (*see id.* ¶ 31), the Superseding Indictment includes no specific allegation regarding Messrs. Sambasivam and Minkkinen's misappropriation of intellectual property. (*See id.* ¶¶ 32–41.)

Messrs. Sambasivam and Minkkinen anticipate that the Government will rely on Sections 1832(a)(2) and (3) to argue that the alleged conspiracy survived into the limitations period. Specifically, they anticipate that the Government will argue that the alleged objectives of violating Section 1832(a)(2) (by "transmit[ting]" trade secrets) or violating Section 1832(a)(3) (by "possess[ing]" trade secrets) were not attained by August 2017. But to the extent the Government

- 7 -

seeks to rely on Sections 1832(a)(2) and (3) to argue that the alleged conspiracy's objectives were not fully attained by that time, the Superseding Indictment's allegations are legally insufficient.

> **a.** **Violations of Section 1832(a)(2) cannot be objectives of the conspiracy during the limitations period.**

First, to the extent the Government invokes violating Section 1832(a)(2) as an objective of the alleged trade secret conspiracy after 2016, the charging language of Count One contains nothing more than a recitation of the statutory provision's language.

That is legally insufficient. To be sure, "an offense that is the object of a conspiracy need not be delineated in the indictment with the same particularity as a substantive offense." *United States v. Hooker*, 841 F.2d 1225, 1229 (4th Cir. 1988). But where the object of a conspiracy is an underlying statutory violation, an indictment must contain more than "a mere citation of the statute under which the indictment issues" to "satisfy the requirement that the indictment contains a clear statement of the elements of the offense charged." *See id.* at 1229–30. Courts accordingly have recognized that for conspiracy counts, "an omission in the charging language of an indictment cannot be cured by a mere statutory citation" of "the underlying offense." *United States v. Werme*, 939 F.2d 108, 112 n.1 (3d Cir. 1991); *see also United States v. Kingrea*, 573 F.3d 186, 193 n.4 (4th Cir. 2009) (disagreeing with *Werme* only to the extent that the Third Circuit took an overly Government-*friendly* approach to the sufficiency of conspiracy indictments).

Count One alleges that Messrs. Sambasivam and Minkkinen "without authorization copied, duplicated, sketched, drew, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, and conveyed" Deloitte's trade secret information, and thus amounts to nothing more than a recitation of Section 1832(a)(2)'s language. (Dkt. No. 186 ¶ 43(b).) Count One's reference to Section 1832(a)(2) is akin to the reference in *Werme*: Section 1832(a)(2) "lists . . . a variety of criminal conduct," spanning

sketching, downloading, and destroying trade secrets. *Werme*, 939 F.2d at 112 n.1. But unlike in *Werme*, the Superseding Indictment provides no indication "which [of these] unlawful activit[ies]" the Defendants allegedly sought to attain after 2016—either in the language of Count One itself or in the introductory allegations that it incorporates by reference. *Id.* To the extent the Government relies on violating Section 1832(a)(2) as an ongoing objective of the conspiracy, the Superseding Indictment does not sufficiently "apprise" Messrs. Sambasivam and Minkkinen "of the nature of the charge" to avoid dismissal under Rule 12. *Hooker*, 841 F.2d at 1230.

> **b.** **Violations of Section 1832(a)(3) cannot be objectives of the conspiracy during the limitations period.**

To the extent the Government invokes violating Section 1832(a)(3) as an objective of the conspiracy after 2016, the Superseding Indictment similarly contains nothing more than a bare recitation of Section 1832(a)(3)'s language. As with Section 1832(a)(2), the Superseding Indictment's recitation of Section 1832(a)(3) fails to provide sufficient notice of any "criminal conduct" that allegedly was an objective of the conspiracy after 2016. *Werme*, 939 F.2d at 112 n.1. But there is an additional reason why any alleged objective of violating Section 1832(a)(3)—by possessing with intent to convert trade secrets—was completed by 2015: the statutory language and legislative history make clear that violating Section 1832(a)(3) is not a continuing offense.

A substantive offense typically "is complete when a person has carried out all of its elements." *Denezpi v. United States*, 596 U.S. 591, 601 (2022). The elements of a Section 1832(a)(3) offense are: (1) the information at issue is a trade secret; (2) the defendants knowingly possessed the trade secrets; (3) the defendants knew the trade secrets were stolen or appropriated, obtained, or converted without authorization; (4) the defendants intended to convert the trade secrets to the economic benefit of anyone other than its owner; (5) the defendants knew the offense

would injure the owner; and (6) the trade secrets were related to a product placed in interstate or foreign commerce. *See United States v. Hanjuan Jin*, 833 F. Supp. 2d 977, 1005 (N.D. Ill. 2012).

For purposes of this motion, the key question is *when* Messrs. Minkkinen and Sambasivam allegedly knowingly possessed the purported trade secret information with intent to convert. The Superseding Indictment alleges that Messrs. Sambasivam and Minkkinen first possessed trade secrets in 2013, when they each separated from Deloitte and purportedly stole Deloitte's trade secrets. (Dkt. No. 186 ¶¶ 10–20.) Any alleged intent to convert a trade secret occurred by 2015, when Sagitec won the Consortium bid to implement unemployment insurance software. (*Id.* ¶ 26–27.) Thus, all elements of any objective to violate Section 1832(a)(3) were satisfied by 2015, at the latest.

To be sure, the "continuing offense doctrine" is an exception to the general statute of limitations rule. *See Toussie*, 397 U.S. at 115. But as the Supreme Court has cautioned, the doctrine "should be applied in only limited circumstances." *Id.* Because the continuing offense doctrine operates to extend the statute of limitations "beyond its stated term," there is "tension between the purpose of a statute of limitations and the continuing offense doctrine." *Id.* An offense is continuing only if one of two requirements is satisfied: (1) "the explicit language of the substantive criminal statute compels such a conclusion" or (2) "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id*.

### i.      *Section 1823(a)(3) fails Toussie's first prong.*

Section 1832(a)(3) does not meet the first *Toussie* prong because Congress did not explicitly authorize a continuing offense as part of that provision. For this first prong, a court must consider the "explicit language of the statute." *United States v. Banks*, 708 F. Supp. 2d 622, 623 (E.D. Ky. 2010). Section 1832(a)(3) plainly contains no explicit language deeming an offense charged under the provision to be continuing. This lack of "continuing offense" demonstrates

- 10 -

Congress did not intend for offenses under that provision to be continuing. *See United States v. Dunne*, 324 F.3d 1158, 1164 (10th Cir. 2003) ("Nothing in the explicit language . . . 'compels' the conclusion that an offense committed thereunder is to be considered a continuing one.").

### ii.  Section 1823(a)(3) fails Toussie's second prong.

Section 1832(a)(3) also does not meet the second *Toussie* prong: the nature of the crime codified is not such that Congress assuredly must have intended to treat it as continuing. In evaluating this prong, courts look at the "language and elements of the offense," including the "legislative history of the offense." *See, e.g.*, *United States v. Askia*, 893 F.3d 1110, 1117 (8th Cir. 2018). Section 1832(a)(3)'s language, in light of the rule of lenity and the provision's legislative history, does not indicate that Congress must have intended to create a continuing offense.

As a threshold matter, the rule of lenity governs the statutory analysis of whether Congress intended an offense to be continuing. *See United States v. Ali*, 982 F. Supp. 2d 85, 87 (D.C. Cir. 2013). The rule of lenity applies where there is a "grievous ambiguity or uncertainty in the statute." *Id.* As *Toussie* clarified:

> [W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.

397 U.S. at 122 (quoting *United States v. Universal Corp.*, 344 U.S. 218, 221–222 (1952)). The rule of lenity is similar to the doctrine requiring a statute of limitations "to be liberally interpreted in favor of 'repose.'" *See United States v. DiSantillo*, 615 F.2d 128, 136 (3d Cir. 1980). If Section 1832(a)(3) is subject to more than one interpretation, the rule of lenity cuts in favor of interpreting Section 1832(a)(3) as not authorizing a continuing offense.

An examination of the legislative history further indicates that Congress did not intend an offense charged under Section 1832(a)(3) to be a "continuing offense." *See also United States v. Gray*, 876 F.2d 1411, 1418 (9th Cir. 1989) (looking to legislative history when a statute's plain

- 11 -

meaning did not reveal whether an offense was continuing). Congress's sole discussion of the statute of limitations within the relevant statute involved debate over whether a charge brought under the statute should be considered a RICO predicate offense.[1] While "statements by individual legislators should not be given controlling effect," "when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent." *Brock v. Pierce Cnty.*, 476 U.S. 253, 263 (1986). If a court liberally interprets the statute of limitations in favor of repose and applies the rule of lenity, the only supportable conclusion is that Congress did not intend for Section 1832(a)(3) offenses to be continuing.[2]

*    *    *

For these reasons, any objectives of the alleged trade secret conspiracy were attained no later than July 2016, before the statute of limitations began to run in August 2017.

### 3.    The Superseding Indictment does not allege any legally sufficient overt acts after August 2017.

The Superseding Indictment further fails to allege any legally sufficient overt act occurring after the statute of limitations began to run in August 2017.

---

[1] ECON. ESPIONAGE, HEARING BEFORE THE HOUSE COMMITTEE ON THE JUDICIARY, SUBCOMMITTEE ON CRIME, 104 CONG. 113, at 73 (1996) (Testimony of FBI Director Louis J. Freeh); ECON. ESPIONAGE, JOINT HEARING BEFORE THE SENATE COMMITTEE ON THE JUDICIARY, SUBCOMM. ON TERRORISM, TECHNOLOGY, AND GOVERNMENT INFORMATION, AND THE SENATE SELECT COMMITTEE ON INTELLIGENCE, 104 CONG. 499, at 18–19 (1996) (Testimony of FBI Director Louis J. Freeh).

[2] No court has squarely addressed whether a Section 1832(a)(3) offense is continuing. But the only case to touch on the issue supports Defendants' position. *See United States v. Latimore*, 2010 U.S. Dist. LEXIS 8338 (E.D. Mich. Feb. 2, 2010). In *Latimore*, the Government appeared to concede that a Section 1832(a)(3) offense is not continuing, instead disputing when the offense was completed. *Id.* at *6.

### a.       Overt acts (a) and (b) are not sufficiently specific.

As a threshold matter, the first two alleged overt acts—acts (a) and (b)—are insufficient to demonstrate that the alleged conspiracy fell within the limitations period because they are not alleged with sufficient specificity to constitute actionable overt acts.

Alleged overt act (a) states that "[f]rom approximately January 2016 until at least about April 8, 2019," Messrs. Sambasivam and Minkkinen "caused the transmission of material containing and derived from Deloitte trade secret information to computers and servers." (Dkt. No. 186 ¶ 47(a).) Alleged overt act (b) similarly states that "[f]rom approximately January 2016 until at least about April 8, 2019," Messrs. Sambasivam and Minkkinen "uploaded and conveyed material containing and derived from Deloitte trade secret information to a Microsoft SharePoint server, knowing and intending that the material would be accessed and downloaded to computers and servers." (*Id.* ¶ 47(b).) These "overt acts" thus amount to nothing more than conclusory allegations that Messrs. Sambasivam and Minkkinen violated Section 1832(a)(2)—by "transmit[ting]," "upload[ing]," and "convey[ing]" trade secrets—at unspecified times falling within a period of more than three years, both inside and outside of the limitations period.

Allegations that a crime occurred during a broad period of time are not sufficiently specific to constitute overt acts. After all, overt acts are required so that indictments provide precision "as to the time of the conspiracy." *United States v. Laykin*, 886 F.2d 1534, 1542 (9th Cir. 1989). In a leading case on this issue, the Fifth Circuit indicated that an overt act constitutes a "specific act" that falls on a particular date. *United States v. Davis*, 533 F.2d 921, 928 (5th Cir. 1976); *see also United States v. Head*, 641 F.2d 174, 178 n.5 (4th Cir. 1981) (citing approvingly to *Davis*). And the Ninth Circuit has found an indictment alleging conspiracy defective where it defined the conspiracy as "beginning on or before July, 1975, and continuing thereafter until on or after

- 13 -

October, 1975," without alleging any specific overt acts occurring within that period. *United States v. Cecil*, 608 F.2d 1294, 1295–97 (9th Cir. 1979).

"The common thread which connects *Cecil* and *Davis* is that the indictment must sufficiently notify the defendant of the charges against him and enable him to prepare a defense." *Laykin*, 886 F.2d at 1542. In *Laykin*, the court addressed an indictment alleging a conspiracy that began "not later than on or about March 1, 1985, and continu[ed] thereafter and including on or about October 14, 1986." *Id.* The court cautioned that this language was "open-ended in both directions," but it concluded that the indictment disclosed sufficient overt acts to "provide a narrowing focus," *id.*, because the indictment included "18 *specific* facts" falling within that time frame," *United States v. Forrester*, 616 F.3d 929, 941 (9th Cir. 2010) (emphasis added).

Applying these principles to this case, alleged overt acts (a) and (b) are defective because they do not specify one or more affirmative transactions, events, or deliberate omissions taking place on or about a specific date after August 2017 in furtherance of the alleged conspiracy. For each of alleged overt acts (a) and (b), the Superseding Indictment alleges a time period of over three years that is "open-ended in both directions." *Laykin*, 886 F.2d at 1542. The Superseding Indictment alleges that the "transmission," "upload[ing]," and "convey[ing]" of trade secret information occurred in "January 2016," without specifically alleging that it *began* in January 2016; and continued "until at least on or about April 8, 2019," without specifically alleging that it *ended* on that date. (Dkt. No. 186 ¶ 47(a)–(b).) And neither the allegations in Count One nor the allegations that Count incorporates by reference "provide [any] narrowing focus." *Laykin*, 886 F.2d at 1542. The Superseding Indictment simply does not allege any specific acts of "transmit[ting]," "upload[ing]," or "convey[ing]" Deloitte's trade secret information after August

2017. As a result, alleged overt acts (a) and (b) do not "provide sufficient information . . . to prepare an adequate defense" and must be disregarded for purposes of this motion. *Id.*[3]

### b.     Overt acts (c), (d), and (e) are acts of concealment.

While the Superseding Indictment does purport to allege three specific overt acts, these alleged overt acts are insufficient under *Grunewald*. Alleged overt act (c) alleges that on or about September 14, 2017, Mr. Minkkinen sent an email to investigating agents that allegedly was designed to conceal the alleged trade secret possession and conspiracy. Alleged overt act (d) alleges that on or about October 1, 2020, during an interview with an investigating agent, Mr. Minkkinen made material misrepresentations about the acquisition, possession, and use of trade secrets. And alleged overt act (e) alleges that on or about March 12, 2021, during an interview with an investigating agent, Mr. Sambasivam made material misrepresentations about the acquisition, possession, and use of trade secrets. But under *Grunewald*, when the object of a conspiracy has been achieved or when the conspiracy has otherwise terminated, later acts of concealment will not qualify as overt acts made in furtherance of the conspiracy for purposes of the statute of limitations.

In *Grunewald*, the issue before the Court was whether a conspiracy charge was barred by a three-year statute of limitations or whether acts of concealment could extend the conspiracy within the limitations period. 353 U.S. at 396. In the alleged conspiracy, Grunewald and other conspirators had arranged for cash payments to a tax official in exchange for "no prosecution" rulings for two taxpayer clients who had been under investigation for tax evasion. *Id.* at 395. In

---

[3] Of note, this Court has ordered the Government to provide Defendants with a Bill of Particulars. (Dkt. Nos. 172, 331.) The Government has not done so, despite Defendants' repeated requests for compliance with the Court's order. Remarkably, the Government is still insisting that even though it charged the case, it does not know what the relevant trade secrets are and is waiting to provide a Bill of Particulars pending Deloitte's response to a subpoena authorized by the Court for relevant records from the related trade secret civil litigation in Delaware federal court between Deloitte and Sagitec.

1948 and 1949, the taxpayers received the sought-after "no prosecution" rulings. *Id.* In 1951, after a congressional investigation was opened, the conspirators caused the disappearance of certain records. *Id.* at 396. In 1952, the Government called the conspirators and the taxpayers before a grand jury. *Id.* The conspirators attempted to conceal their crime by, among other things, inducing the taxpayers not to speak to the grand jury. *Id.*

The conspirators in *Grunewald* argued that the prosecution was barred by the statute of limitations because the conspiracy ended when they obtained the "no prosecution" rulings. *Grunewald*, 353 U.S. at 398. The Government argued that the conspiracy included a subsidiary element to conceal the conspiracy and to avoid detection by the Government and therefore it continued into 1952. *Id.* at 399. The Court rejected the Government's argument:

> [A]fter the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.

*Id*. at 401–02. The Court reasoned that "every conspiracy is by its very nature secret" and that "every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces." *Id*. at 402. The Court thus clarified that "a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." *Id*. at 405 (emphasis in original). Crucial to this distinction is whether the Government can prove "an express original agreement among the conspirators to continue to act in concert in order to cover up," as opposed merely to proving an implied subsidiary conspiracy to conceal the original conspiracy. *Id*. at 404.

In this case, the Government has not alleged—nor could the Government allege—an express original agreement among the conspirators to continue to act in concert in order to cover

- 16 -

up the alleged trade secret crime. Instead, the Government relies solely on the same type of implied subsidiary conspiracy to conceal the crime that the *Grunewald* Court held is insufficient to extend the limitations period. As discussed, the objectives of the alleged conspiracy were obtained no later than 2016. *See* Part II.A.2, *supra*. But the first specific alleged overt act, Mr. Minkkinen's email to investigators, did not occur until September 2017, or one month after the statute of limitations cutoff of August 2017. The Superseding Indictment alleges that the email "was designed to conceal and misrepresent" the alleged trade secret crime. (Dkt. No. 186 ¶ 47(c).) The Superseding Indictment similarly alleges that Mr. Minkkinen "made material misrepresentations" about the alleged trade secret crime in an interview with an investigator in October 2020 and that Mr. Sambasivam "made material misrepresentations" about the alleged trade secret crime in an interview with an investigator in March 2021. (*Id.* ¶ 47(d)–(e).) Under *Grunewald*, each of these specific alleged overt acts constitutes an alleged subsidiary conspiracy to conceal the primary alleged trade secret conspiracy after its central objectives had been obtained. It follows that none of these specific alleged overt acts is legally sufficient to satisfy the statute of limitations.[4]

**B.      Count Two is barred by the statute of limitations and Counts Three through Five fail to state an offense.**

Counts Two through Five of the Superseding Indictment—wire fraud conspiracy and three charges of substantive wire fraud—must be dismissed for similar reasons. Specifically, these counts must be dismissed because the objects of the wire fraud that the Government alleges in the Superseding Indictment were attained before the limitations period.

---

[4] In addition to running afoul of *Grunewald*, Count One is barred by the statute of limitations for another reason: alleged overt acts (c) through (e) are not actionable. The conduct alleged in these overt acts consists of statements to investigators denying wrongdoing. This type of conduct is the equivalent of a failure voluntarily to confess to an alleged crime, which cannot form the basis of an overt act in furtherance of a conspiracy. *See Kang*, 715 F. Supp. 2d at 666 (questioning whether an overt act can consist of a "failure to immediately and voluntarily confess to" an investigator "that they had participated in" a conspiracy where the defendants merely denied criminal activity).

"To be guilty of wire fraud, a defendant must (1) devise or intend to devise a scheme (2) to obtain money or property (3) by means of false or fraudulent pretenses, representations, or promises." *Kousisis v. United States*, 605 U.S. 114, 123 (2025) (citation modified). And to be guilty of wire fraud conspiracy under 18 U.S.C. § 1349, "the commission" of an underlying wire fraud offense must have been "the object of the . . . conspiracy." Because a substantive wire fraud offense must have property as its object—and because a wire fraud conspiracy must have such a substantive offense as its object—it follows that, as a general rule, Counts Two through Five were completed when the Defendants obtained the relevant property. It is settled "that the crime of . . . wire fraud is complete when the defendant . . . obtains the target money or property." *United States v. Okun*, 2009 U.S. Dist. LEXIS 12419, at *7 (E.D. Va. Feb. 18, 2009).

### 1.      Any property was obtained before the limitations period.

The Government identifies only two objects of the alleged wire fraud offenses: (1) Deloitte's intellectual property and (2) the "lucrative" Consortium contract. (*See* Dkt. No. 266 at 9.) On the face of the Superseding Indictment, Defendants obtained any property interests associated with those objects before the limitations period.

### a.      Defendants allegedly obtained Deloitte IP no later than 2013.

On the face of the Superseding Indictment, Defendants obtained Deloitte's intellectual property no later than 2013. That is because Messrs. Sambasivam and Minkkinen left Deloitte's employment in 2013. (Dkt. No. 186 ¶ 6.) While the Superseding Indictment includes additional allegations regarding the Defendants' *use* of that property, that alleged use is irrelevant to when any wire fraud offenses were completed. What matters for the completion of wire fraud offenses is when "the target money or property" is "obtain[ed]," not whether a defendant continues to use or possess the target property after the defendant obtains it. *Okun*, 2009 U.S. Dist. LEXIS 12419, at *7. It follows that to the extent the Government alleges that the object of the Defendants' wire

fraud offenses was Deloitte's intellectual property, that object was obtained—and any corresponding wire fraud offense was complete—in 2013, before the limitations period.

### b.        Sagitec obtained a future payment interest by 2015.

As for the Consortium contract, Sagitec obtained any relevant property interests when the contract was executed in 2015. That is because the contract's terms provided "that Sagitec would be paid . . . for its services" under the contract. (Dkt. No. 186 ¶ 27.) When the parties executed the contract, Sagitec thus received "an enforceable right to payment created by contract." *United States v. Sullivan*, 118 F.4th 170, 209 (2d Cir. 2024). Courts routinely have held that a contractual right to payment is an "intangible" property interest for wire fraud purposes. *See id.* (collecting cases).

The Government likely will respond that while Sagitec may have received a property interest when the parties executed the Consortium contract, the actual payments that Sagitec received under the contract constituted independent property interests evidencing an ongoing scheme to defraud. That argument fails for two principal reasons. As a matter of law, any scheme to defraud necessarily reached fruition when Sagitec received an intangible right to payment upon execution, insofar as the actual payments that Sagitec received pursuant to the Consortium contract were economically equivalent to that intangible right. And analogizing the allegations in the Superseding Indictment to common-law fraudulent inducement clarifies that wire fraud directed at a contract, which gives rise to a right to payment, is completed upon execution.

### i.        *Economic Equivalence*

As a threshold matter, the Superseding Indictment makes clear that the payments at issue in this case were made pursuant to the Consortium contract. The Superseding Indictment alleges that "more than $100 million has been expended on the [Consortium] project." (Dkt. No. 186 ¶ 27.) And the Government has conceded as much in papers it previously has filed in this matter: "the Superseding Indictment focuses on an actual loss of money caused by the defendants' deception

relating to contract requirements." (Dkt. No. 266 at 9; *see also id.* at 8.) It follows that when the Consortium contract was executed in 2015, Sagitec obtained a right to future payment that corresponded to any payments Sagitec actually received under the contract.

On multiple occasions, the Supreme Court has held that a scheme to defraud reaches "fruition," for purposes of the mail and wire fraud statutes, when the defendant "receive[s]" the money or property that was the scheme's object. *See Kann v. United States*, 323 U.S. 88, 94 (1944); *Parr v. United States*, 363 U.S. 370, 393 (1960); *United States v. Maze*, 414 U.S. 395, 400–02 (1974); *Schmuck v. United States*, 489 U.S. 705, 711–15 (1989). A scheme to defraud has reached fruition if subsequent mailings, wire communications, or events are "immaterial" to the defendant's receipt of the target property. *See id.*

Any scheme to defraud reached fruition upon the Consortium contract's execution, when Sagitec received an intangible right to payment, because any subsequent payments Sagitec received were "immaterial"—as a matter of basic economics—to the value of the property interest that Sagitec received upon execution. The Supreme Court has compared "[t]he right to be paid money" and the receipt of actual payments in analyzing the wire fraud statute. *Pasquantino v. United States*, 544 U.S. 349, 356 (2005). It has clarified that the former is "a species of property" for purposes of wire fraud, and that there is an "*economic equivalence* between money in hand and money legally due." *Id.* (emphasis added). It follows that Sagitec's intangible property interest in "money legally due" under the Consortium contract, at the time the contract was executed, was "economic[ally] equivalen[t]" to any payments that Sagitec ultimately received "in hand" pursuant to the contract. *Id.* Any scheme to defraud accordingly reached "fruition" upon the Consortium contract's execution in 2015, insofar as any payments Sagitec subsequently received were

economically "immaterial" to the value of the future right to payment upon execution. *See Kann*, 323 U.S. at 94; *Parr*, 363 U.S. at 393; *Maze*, 414 U.S. at 400–02; *Schmuck*, 489 U.S. at 711–15.

### ii.   Common-Law Fraudulent Inducement

The Supreme Court's decision in *Kousisis* provides further support for the proposition that if wire fraud is directed at obtaining a contractual right to payment, the crime is completed when the contract is executed. *Kousisis* clarified that "the wire fraud statute" incorporates "the common-law understanding of fraud." 605 U.S. at 124. And *Kousisis* dealt with the same type of fraud that is alleged here: fraudulent inducement. *Id.* at 118. The *Kousisis* Court thus looked to common-law fraudulent inducement to determine when a crime under the wire fraud statute is completed. It concluded that a common-law "fraud is complete when the defendant has induced the deprivation of money or property under materially false pretenses," regardless of whether the victim of the fraud had suffered a "pecuniary loss." *Id.* at 127 n.5. It accordingly concluded that wire fraud may be completed even if it does not cause a victim to suffer a pecuniary loss. *See id.* at 129.

Applying *Kousisis* to this case, it follows that any fraud with respect to the Consortium contract was complete—for purposes of the statute of limitations—when an analogous fraud would have been considered complete at common law. The Government's theory is that Defendants fraudulently induced the Consortium to enter into the Consortium contract by misrepresenting that Sagitec would not use Deloitte's intellectual property to complete the project. Assuming the Government is correct that Defendants fraudulently induced the Consortium contract, the Defendants would have completed the analogous tort of fraudulent inducement when the contract was executed in 2015. Courts broadly recognize that a remedy arises for fraudulent inducement when the fraudulently induced contract is executed. *See, e.g.*, *Rogal v. Wechsler*, 135 A.D.2d 384, 385 (Sup. Ct. N.Y. 1st Dep't 1987) (recognizing that a "cause of action for fraud accrues and the Statute of Limitations commences to run at the time of the execution of the contract"). At common

- 21 -

law, the Consortium would have been able to sue Sagitec "to *rescind* the fraud-infected [Consortium] contract[]" immediately upon execution, even before suffering any "economic loss." *Kousisis*, 605 U.S. at 125 (emphasis added). It follows that Defendants completed any wire fraud in connection with the contract when it was executed in 2015.

### 2.      The Superseding Indictment's wire fraud counts thus fail.

Because Defendants allegedly obtained any "property" that could have been the object of wire fraud by 2015, Count Two must be dismissed under the statute of limitations and Counts Three through Five must be dismissed for failure to state an offense.

Count Two, wire fraud conspiracy, is time-barred under *Grunewald*. Any unlawful objectives of the alleged conspiracy necessarily were attained when Defendants obtained the only property that could have been the object of wire fraud: Deloitte's intellectual property and any property interests stemming from the Consortium contract. Defendants allegedly obtained Deloitte's intellectual property in 2013, and the parties executed the Consortium contract in 2015, so any unlawful objectives of the conspiracy were attained by 2015. While the Superseding Indictment alleges that Defendants furthered the conspiracy by making material misrepresentations to investigators in 2017, 2020, and 2021, (Dkt. No. 186 ¶¶ 47, 54), those misrepresentations were, at most, "acts of concealment done after the[] central objectives [of the conspiracy] ha[d] been attained" in 2015, *Grunewald*, 353 U.S. at 405.

Counts Three through Five similarly fail to state an offense for substantive wire fraud because they concern wires that Defendants allegedly sent in 2017, 2020, and 2021. A substantive wire fraud count fails unless the alleged wire furthered a scheme directed at obtaining money or property. *See Kousisis*, 605 U.S. at 121–22. Defendants obtained any property that could have been the object of wire fraud by 2015, such that the 2017, 2020, and 2021 wires could not have furthered a scheme to obtain property and thus fail to support substantive wire fraud offenses. *See id.*

### 3. Counts Three through Five also fail because the alleged wires were not in furtherance of any scheme to defraud.

Even assuming that Defendants had not obtained the relevant property before the limitations period, Counts Three through Five fail for an additional reason. To state a substantive wire fraud offense, the Superseding Indictment must allege both (1) "a scheme to defraud" Deloitte and the Consortium and (2) that Defendants "used . . . [interstate] wire communications in furtherance of that scheme." *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012). The latter requirement is an essential jurisdictional element of a wire fraud offense: "[t]he federal [wire] fraud statute does not purport to reach all frauds, but only those limited instances in which the use of [interstate wires] is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Cf. Kann v. United States*, 323 U.S. 88, 95 (1944) (mail fraud); *see also United States v. Jefferson*, 674 F.3d 332, 336 (4th Cir. 2012) (recognizing that the mail and wire fraud statutes are interpreted in parallel). For several reasons, the 2017, 2020, and 2021 wires forming the basis for Counts Three through Five could not have been in furtherance of any scheme to defraud Deloitte or the Consortium.

First, the wires could not have been in furtherance of any scheme to defraud because they were initiated or induced by government investigators, not by Messrs. Minkkinen or Sambasivam. The Government cannot dispute that Mr. Minkkinen's October 2020 interview and Mr. Sambasivam's March 2021 interview—the bases for Counts Four and Five—were expressly requested by investigators. And on the face of the Superseding Indictment, Mr. Minkkinen's September 2017 email to investigators—the basis for Count Three—was sent in response to a "criminal investigation in the matter." (Dkt. No. 186 ¶ 40.) Courts have concluded that mailings or wire communications that a defendant "did not directly or impliedly invite" cannot supply a basis for federal fraud jurisdiction, *e.g.*, *United States v. Otto*, 742 F.2d 104, 109 (3d Cir. 1984),

and for good reason. If the Government could rely on induced wires, it would always be able to avoid the statute of limitations and manufacture federal jurisdiction in connection with frauds: the Government invariably can initiate wire communications with suspects within the limitations period. The induced wires underlying Counts Three through Five accordingly are analogous to the interstate communication at issue in *United States v. Coates*, where the Fourth Circuit concluded that a "government agent['s] . . . telephone call across state lines . . . induce[d] [a] defendant to 'use' that interstate facility to discuss [a] scheme," and "that such 'manufactured jurisdiction' cannot form the basis for a federal prosecution." 949 F.2d 104, 105–06 (4th Cir. 1991).[5] In sum: the Government has not alleged a single wire communication in furtherance of the alleged scheme to defraud, and falling within the limitations period, that was not initiated by the Government.

In addition, the alleged wires could not have been in furtherance of any scheme to defraud because each of the wires constituted a communication to investigators in which Mr. Minkkinen or Mr. Sambasivam denied wrongdoing with respect to Deloitte intellectual property and the Consortium contract. (*See* Dkt. No. 186 ¶¶ 47, 54, 61.) Courts have concluded that such alleged efforts "to cover-up . . . wrongdoing," undertaken *after* an alleged scheme to defraud "was under investigation by" government authorities, are not "in furtherance" of such a scheme for wire fraud purposes. *E.g.*, *United States v. Kerik*, 615 F. Supp. 2d 256, 270 (S.D.N.Y. 2009); *see also United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1435 (S.D.N.Y. 1989). After all, wire fraud must involve "misrepresent[ations] with the design of depriving [a] victim of something of

---

[5] Because the alleged wires were initiated by investigators, the Government also cannot plausibly argue that Messrs. Minkkinen or Sambasivam "caused" the wires "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 8 (1954). The Superseding Indictment provides no basis to support the conclusion that when Messrs. Minkkinen or Sambasivam allegedly devised a scheme to defraud Deloitte and the Consortium between 2013 and 2015, they "act[ed] with knowledge that" investigator-initiated interviews would "follow in the ordinary course of business" or otherwise could "reasonably be foreseen." *Id.* at 8–9.

value"; the Superseding Indictment simply does not explain how wires initiated by the Government for the purpose of investigating an alleged scheme to defraud could have furthered the Defendants' obtaining of money or property. *Wynn*, 685 F.3d at 478. The wires thus were not "incident to an essential part of [a] scheme" to obtain money or property through fraud. *United States v. Burfoot*, 899 F.3d 326, 335 (4th Cir. 2018).

Counts Three through Five further fail because it is undisputed that when the alleged wires were sent, the Government already was aware of the core allegations that form the basis for the scheme to defraud alleged in the Superseding Indictment. According to interview memoranda produced by the Government, the U.S. Attorney's Office for the Southern District of West Virginia had learned by October and November 2016 that Sagitec team members previously worked at Deloitte, that they performed similar work on unemployment insurance products while at Deloitte, and that the Government's informant believed Sagitec was using Deloitte's purported intellectual property to perform work for the Consortium. (*See* Dkt. Nos. 149-6, 149-7); *see also United States v. Minkkinen*, 678 F. Supp. 3d 778, 787 (S.D. W. Va. 2023). The Government further notified Sagitec that it was the target of a criminal investigation in 2019, before Mr. Minkkinen's October 2020 interview; and the Government issued a target letter to Mr. Minkkinen in December 2020, before Mr. Sambasivam's March 2021 interview. *See Minkkinen*, 678 F. Supp. 3d at 787. Because the Government thus was aware of the alleged scheme to defraud before the 2017, 2020, and 2021 wire communications, those wires—to the extent they included Defendants' denials of the alleged scheme's existence—could not successfully have constituted "a step in [a] plot" of concealing the alleged scheme and thus could not have furthered that scheme in practice. *Burfoot*, 899 F.3d at 335 (citation modified); *see also* U.S. Dep't of Just., Justice Manual § 9-11.151 (defining a "target" as

- 25 -

"a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant").

Defendants anticipate that the Government will argue that even if the 2017, 2020, and 2021 wires did not further the alleged scheme to defraud in practice, the wires constitute cognizable bases for wire fraud to the extent Messrs. Minkkinen and Sambasivam merely *intended* them to further that alleged scheme. But the Fourth Circuit has made clear, in addressing the mail fraud statute, that the Government must "pro[ve] that the mails *played a significant part* in the execution of the scheme." *United States v. Caldwell*, 544 F.2d 691, 696 (4th Cir. 1976) (emphasis added); *see United States v. Gorrell*, 1992 U.S. App. LEXIS 9037, at *8 (4th Cir. 1992) (same). It follows that because Messrs. Minkkinen and Sambasivam's denials of wrongdoing could not have "played a significant part in the execution of the [alleged] scheme," given the Government's contemporaneous awareness of the alleged scheme's existence, any mere intention on Defendants' part to further that scheme is insufficient to preclude dismissal.

Finally, Defendants anticipate that the Government will attempt to characterize the 2017, 2020, and 2021 wires as "lulling" communications falling within the scope of the wire fraud statute. But the Government does not allege that the alleged victims of the scheme to defraud, Deloitte and the Consortium, received or were aware of those wires. A wire constitutes a "lulling" communication only if it is directed at a victim. *See, e.g.*, *United States v. Pierce*, 409 F.3d 228, 232–33 (4th Cir. 2005) (collecting cases). Because the alleged wires, on the Superseding Indictment's face, constituted efforts to conceal wrongdoing from investigators, the wires were not "designed to lull [any] victims into a false sense of security" and thus fall outside the scope of the wire fraud statute. *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (citation omitted).

## IV.   CONCLUSION

The Government's decision to charge the "elastic, sprawling and pervasive offense" of conspiracy, in an apparent attempt to avoid the statute of limitations, poses "a serious threat to fairness"—especially to the extent the Government charges trade secret conspiracy "in lieu of prosecuting for the substantive offense itself." *See Krulewitch v. United States*, 336 U.S. 440, 445–46 (1949) (Jackson, J., concurring). And the Government's attempt to manufacture jurisdiction over Counts Three through Five by relying on investigator-initiated wire communications poses a similar threat. For the reasons set forth above, Mr. Sambasivam and Mr. Minkkinen respectfully ask the Court to dismiss Counts One through Five of the Superseding Indictment.


Dated: July 2, 2026                                      Respectfully submitted,

                                             By:   */s/ Susan M. Robinson*
                                                    Susan M. Robinson (WVSB #5169)
                                                    **Thomas Combs & Spann, PLLC**
                                                    300 Summers Street, Suite 1380
                                                    P.O. Box 3824
                                                    Charleston, WV 25338
                                                    T: (304) 414-1800
                                                    F: (304) 414-1801
                                                    srobinson@tcspllc.com

                                                    RJ Zayed
                                                    Nicole Engisch
                                                    Ellie Soskin
                                                    **Dorsey & Whitney LLP**
                                                    50 South Sixth Street, Suite 1500
                                                    Minneapolis, MN 55402
                                                    T: (612) 340-2600
                                                    F: (612) 340-2868
                                                    zayed.rj@dorsey.com
                                                    engisch.nicole@dorsey.com
                                                    soskin.ellie@dorsey.com

                                                    *Attorneys for Defendant Sambasivam*

                                                    */s/ Stephen S. Stallings*
                                                    Stephen S. Stallings, Esquire (PA # 205131)
                                                    **The Law Offices of Stephen S. Stallings, Esq.**
                                                    310 Grant Street, Suite 3600
                                                    Pittsburgh, PA 15219

T: 412.322.7777
F: 412-322-7773
attorney@stevestallingslaw.com

*/s/ Michael Edward Nogay*
Michael Edward Nogay, Esq.
**Sellitti, Nogay & Nogay, PLLC**
P.O. Bo 3095
Weirton, WV 26062
T: 304.723.1400
F: 304.723.3252
Mike@NogayLaw.com

*Counsel for Defendant David Gerald Minkkinen*

- 28 -